UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| J.A. SCHEIBEL, INC. t/a<br>SCHEIBEL CONSTRUCTION<br>115 Prospect Drive<br>Huntingtown, MD 20639<br><br>    Plaintiff,<br><br>v.<br><br>STEELE FOUNDATION, LLC<br>3299 K Street, NW, Suite 601<br>Washington, DC 20002<br><br>Serve:  Officer or Director<br>        Steele Foundation, LLC<br>        3229 K Street, NW, Suite 601<br>        Washington, DC 20002<br><br>    Defendant. | Case No.: _____ |

## **COMPLAINT**

Comes now the Plaintiff, J.A. Scheibel, Inc., trading as Scheibel Construction ("Scheibel"), by counsel, and files this Complaint against the Defendant, Steele Foundation, LLC ("Steele"), as follows:

## **PARTIES**

1.      Scheibel is a Maryland corporation with its principal place of business in Maryland that is licensed to conduct business in the District of Columbia.  Scheibel operates as a general contractor.

2.      Steele is a Virginia corporation with its principal place of business in the District of Columbia.  Steele operates as a shoring and underpinning subcontractor.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. Venue is proper in this Court as the incidents complained of herein occurred in the District of Columbia, and the construction project that is the subject of this suit is located in the District of Columbia.

## FACTS

### Background

5. This case arises out of Steele's failure to properly design, construct, and administer the "shoring and underpinning" system for an eight-story hotel located at 501 New York Avenue, NE, Washington, DC (the "Project").

6. Shoring and underpinning is used at construction sites to provide temporary support of and resistance against adjacent soils and structures.

7. Shoring and underpinning typically involves the use of: (i) "soldier piles," which are vertical beams driven below the point of excavation to provide resistance to adjacent soils; and (ii) "rakers," which connect to the soldier piles near the top of the soldier piles and to wood "lagging," which is installed around the edge of the subject property, thereby providing lateral support to "soldier piles" and providing resistance to adjacent soils.

8. The soldier piles, rakers, and lagging are used in conjunction with each other until below-grade level walls and floors are constructed and become capable of resisting pressures from below-grade soil and water pressure.

**Relevant Contracts**

9. Pursuant to an April 2, 2013 agreement between Scheibel and the Project owner, NOMA Hospitality (the "Owner/Contractor Agreement"), Scheibel agreed to provide certain general contracting services in connection with the Project.

10. Pursuant to an April 24, 2014 agreement between Scheibel and Steele (the "Subcontractor Agreement"), Steele agreed to design and build the shoring and underpinning for the Project. The Subcontractor Agreement is attached hereto as **Exhibit 1**.

11. Pursuant to Section 1 of the Subcontractor Agreement, Steele agreed "to furnish all supervision, labor, tools, equipment, materials and supplies necessary to perform all work set forth in Exhibit A" of the Subcontractor Agreement and agreed to do so in accordance with the terms and conditions of both the Subcontractor Agreement (and Exhibit A thereto) (**Exhibit 1**) and the Owner/Contractor Agreement.

12. The Subcontractor Agreement further contemplated that Steele would "provide for a complete scope of work," thereby tasking Steele with both the design and construction of the shoring and underpinning for the Project.

13. In addition, pursuant to Paragraph 22 of Exhibit A to the Subcontractor Agreement (**Exhibit 1**), Steele expressly agreed to "[f]urnish and install sheeting as indicated on the contract documents and as outlined on subcontractor's design documents."

14. The "contract documents" alluded to in Paragraph 22 of Exhibit A to the Subcontractor Agreement (**Exhibit 1**) included, but were not limited to, "3/21/2013 Steele Foundation shop drawings and updated versions of as contract documents to define construction details of sheeting and underpinning work."

15.   As set forth below, Steele failed to properly design the shoring and underpinning system.

16.   As set forth below, Steele also failed to construct the shoring and underpinning system in accordance with its own design.

17.   As set forth below, Steele also failed to comply with its design/build obligations as it removed rakers from the shoring and underpinning system before it was determined that the system was stable enough to allow for the removal of the rakers.

18.   Steele's deficient design and construction caused significant disruption to the Project; caused significant damage to Scheibel; and has given rise to additional, potential liability of Scheibel for which Steele has an express obligation to defend and indemnify Scheibel.

### The Failure of Steele's Shoring and Underpinning System

19.   On or about March 4, 2014, Steele's shoring and underpinning system rotated and failed, causing lateral movement of the retained soil behind the soldier piles and causing lateral movement at the base of the shoring system (the "Failure").

20.   The Failure was caused by: (i) Steele's failure to design the shoring and underpinning system for the soil conditions that were presumed by the contract documents and confirmed as existing conditions by subsequent investigations into the Failure; (ii) Steele's failure to provide for the depth of embedment for soldier beams as prescribed by its own shoring and underpinning design; (iii) Steele's failure to provide for verification of the adequacy of its excavation support system before removal of the rakers; and (iv) Steele's failure to take into account climatic conditions applicable to the work it was performing.

21.   Specifically, soil investigation conducted after the Failure confirmed that the soil conditions contemplated by Steele's shoring and underpinning design were, in fact, consistent

4

with those conditions that existed at the Project site. The investigation concluded that Steele's shoring and underpinning system was not properly designed for those soil conditions. Thus, Steele's design was inadequate.

22. Investigation into the Failure also established that, with respect to the soldier piles on the east side of the Project, Steele failed to install those soldier piles at the depths prescribed by its own construction drawings, and that inadequate embedment was a cause of the Failure. Thus, Steele's construction was deficient.

23. Investigation into the Failure further demonstrated that Steele removed the rakers without first confirming the stability of the remaining shoring and underpinning system. Thus, Steele's administration of its defective design and construction was inadequate, deficient, and in breach of its contractual obligations.

24. Based on Steele's response to the Failure, it appears that Steele's design failed to take into account freeze-thaw, snow, rain and other conditions typically found in the Washington, D.C. area during the time of year when this work was performed.

## COUNT I – BREACH OF CONTRACT

25. The foregoing paragraphs are incorporated herein by reference as if set forth in full.

26. As set forth above, Steele agreed to provide shoring and underpinning services as set forth in the Subcontractor Agreement.

27. Steele failed to provide services as required by the Subcontractor Agreement, in that: (i) its shoring and underpinning design was inadequate for the soil conditions that were presumed in the design and actually existed on the Project site; (ii) it failed to provide for the depth of embedment for the soldier beams, as prescribed by Steele's own design; (iii) it failed to

provide for verification of the adequacy of the excavation support system before removal of the rakers; and (iv) failed to take into account normal winter climatic conditions.

28. The above-referenced errors and omissions constitute material breaches of the Subcontractor Agreement.

29. As a direct and proximate result of Steele's material breaches of the Subcontractor Agreement, Scheibel has been damaged. Those damages include, but are not limited to, costs associated with remediating the Failure, costs associated with having to re-work tasks impacted by the Failure, costs associated with restoring the Project site and the adjacent site, delays and disruption caused by the Failure, and costs associated with investigating the cause(s) of the Failure.

30. Scheibel has performed all of its obligations under the Subcontractor Agreement except to the extent waived, excused or prevented.

WHEREFORE, Scheibel hereby requests judgment against Steele in an amount of not less than FIVE HUNDRED THOUSAND DOLLARS AND NO CENTS ($500,000.00), plus interest, costs, attorneys' fees, and any other relief in favor of Scheibel which the Court may deem appropriate.

## COUNT II – CONTRACTUAL INDEMNIFICATION

31. The foregoing paragraphs are incorporated herein by reference as if set forth in full.

32. Paragraph 10 of the Subcontractor Agreement expressly provides, in relevant part, that Steele "specifically obligates itself to defend, indemnify and protect the Contractor [Scheibel] and hold it harmless from any and all claims, suits, liabilities arising out of the

performance of the work or in any way occasioned by any act omission or negligence of the Subcontractor …"

33. In this case, the Project owner has asserted claims against Scheibel that arise out of Steele's design and construction of the shoring and underpinning system.

34. To date, the Project owner's claims total ONE MILLION FOUR HUNDRED THIRTY FOUR THOUSAND NINE HUNDRED FORTY SEVEN DOLLARS AND NO CENTS ($1,434,947.00).

35. If Scheibel is adjudged responsible for causing the alleged damages to the Project owner, then Steele is contractually obligated to indemnify Scheibel for any such damages.

WHEREFORE, Scheibel hereby requests indemnity from Steele for the amount of any valid Project owner claims for which it may be liable as a result of the Project owner's claims, as well as costs and attorneys' fees associated therewith and any other relief in favor of Scheibel which the Court may deem appropriate.

Respectfully submitted,

 /s/ Alison R. Mullins
Joseph H. Kasimer (DC Bar # 230505)
Alison R. Mullins (DC Bar # 982407)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911 Telephone
(703) 848-2530 Facsimile
jkasimer@reesbroome.com
amullins@reesbroome.com
*Counsel for Plaintiff J.A. Scheibel, Inc. t/a Scheibel Construction*

OF COUNSEL:

Mark P. Graham (*pro hac vice* motion to be filed)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911 Telephone
(703) 848-2530 Facsimile
mgraham@reesbroome.com
*Counsel for Plaintiff J.A. Scheibel, Inc. t/a Scheibel Construction*

K:\90\90578\00103\PLDNGS\141001 Steele Complaint (v5-arm).docx